IN THE UNITED STATES DISTRICT COURT FOR

THE WESTERN DISTRICT OF OKLAHOMA

RENA THOMAS,                                    )
                                                )
              Plaintiff,                        )
                                                )
vs.                                             )        No. CIV-16-773-W
                                                )
CRUSH ENTERPRISES, INC. d/b/a                   )
JAN-PRO CLEANING SYSTEMS and                    )
SOUTHWEST AMBULATORY                            )
SURGERY CENTER, LLC d/b/a                       )
OKLAHOMA CENTER FOR                             )
ORTHOPAEDIC & MULTI-SPECIALTY                   )
SURGERY, LLC,                                   )
                                                )
              Defendants.                       )

## ORDER

This matter comes before the Court on the Motions for Summary Judgment filed
by defendants Crush Enterprises, Inc. d/b/a Jan-Pro Cleaning Systems ("Jan-Pro") and
Southwest Ambulatory Surgery Center, LLC d/b/a Oklahoma Center for Orthopaedic &
Multi-Specialty Surgery, LLC ("OCOM"), pursuant to Rule 56, F.R.Civ.P.  Plaintiff Rena
Thomas has responded, and the defendants have filed replies in support of their requests
for judgment as a matter of law.

Thomas, a 57-year-old African American female, brought this action on July 7,
2016; she has alleged in her complaint that she is the victim of race and national origin
discrimination and harassment as well as retaliation for engaging in protected activity in
violation of Title VII of the Civil Rights Act ("Title VII"), as amended, 42 U.S.C. § 2000e et
seq., title 42, section 1981 of the United States Code and the Oklahoma Anti-

Discrimination Act ("OADA"), 25 O.S. § 1101 et seq.[1]  The defendants have challenged

each cause of action.

Summary judgment should be granted to a defendant if that defendant "shows that

there is no genuine dispute as to any material fact[2] and [that it] . . . is entitled to judgment

as a matter of law." Rule 56(a), F.R.Civ.P.[3]  At this stage of the litigation, the Court does

not evaluate the credibility of the witnesses, e.g., Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 255 (1986), or "weigh the evidence and determine the truth of the matter . . . ."

Id. at 249.  Rather, the Court must

> decide whether there is a genuine issue for trial . . . [and] there is no [triable]
> issue . . . unless there is sufficient evidence favoring the nonmoving party
> for a jury to return a verdict for that party.  If the evidence is merely colorable,
> or is not significantly probative, summary judgment may be granted.

Id. at 249-50 (citations omitted).  The Court's inquiry must be whether the evidence, when

viewed "through the prism of the substantive evidentiary burden," id. at 254, "presents a

---

[1]To the extent, if any, Thomas has alleged a violation of title 42, section 1983 of the United States Code in her complaint and cited the fourteenth amendment to the United States Constitution as the basis for that claim, see Doc. 1 at 5, ¶ 27, such cause of action fails.  "[P]rivate conduct, . . . '"however discriminatory or wrongful,"' is not subject to the [f]ourteenth [a]mendment's prohibitions." Gallagher v. Neil Young Freedom Concert, 49 F.3d 1442, 1446 (10th Cir. 1995)(quoting Jackson v. Metropolitan Edison Co., 419 U.S. 345, 349 (1974)(further quotation omitted)); e.g., id. at 1447 (under section 1983, liability attaches only to conduct occurring under color of law).

[2]"A dispute is genuine when 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party,'" Bird v. West Valley City, 832 F.3d 1188, 1199 (10th Cir. 2016) (quoting Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986)); "a fact is material when it 'might affect the outcome of the suit under the governing [substantive] law.'" Id. (quoting Liberty Lobby, 477 U.S. at 248).

[3]The federal rules permit a party to "move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Rule 56(a), supra.

sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52.

"In making this determination, . . . [the Court must] 'examine the record and all reasonable inferences that might be drawn from it in the light most favorable to [Thomas,] the non-moving party.'" Pinkerton v. Colorado Department of Transportation, 563 F.3d 1052, 1058 (10th Cir. 2009)(quoting T-Mobile Central, LLC v. Unified Government of Wyandotte County, 546 F.3d 1299, 1306 (10th Cir. 2008)(citations omitted)). That is to say, the Court must accept Thomas' account of the events giving rise to this lawsuit to the extent that account is supported by the record and not based upon mere conclusory allegations or, as in this case, rank speculation regarding the defendants' actions and the reasons therefor. E.g., McKibben v. Chubb, 840 F.2d 1525, 1528 (10th Cir. 1988) (while facts must be construed liberally in favor of nonmovant, unsupported conclusory allegations not sufficient to establish disputed issues of fact).

"OCOM is a specialty surgical and MRI facility[,]" Affidavit of Michael Kimzey (August 18, 2017) at p. 1, ¶ 3 (hereafter "Kimzey Affidavit"),[4] that leases space—Buildings

---

[4]"An affidavit . . . [may be] used to support or oppose a motion [for summary judgment if it is] . . . made on personal knowledge, set[s] out facts that would be admissible in evidence, and show[s] that the affiant . . . is competent to testify on the matters stated." Rule 56(c)(4), supra. An affidavit, however, cannot be used to create a genuine issue of material fact if the information contained therein conflicts with the affiant's sworn testimony and the Court finds the affidavit "'constitutes an attempt to create a sham fact issue.'" Law Co., Inc. v. Mohawk Construction and Supply Co., 577 F.3d 1164, 1169 (10th Cir. 2009)(quotation omitted).

An affidavit therefore need "'not be disregarded [merely] because it conflicts with the affiant's prior sworn statements.'" Id. (quotation omitted). It will be ignored only if the Court also determines that the affidavit is submitted to create a sham factual issue. In determining whether the affidavit has been submitted for that purpose, the Court may consider "whether: '(1) the affiant was cross-examined during his [or her] earlier testimony; (2) the affiant had access to the pertinent evidence at the time of his [or her] earlier testimony or whether the affidavit was based on newly discovered evidence; and (3) the earlier testimony reflects confusion which the affidavit attempts to explain.'" Id. (quotation omitted). The Court has considered Thomas' and Kimzey's affidavits in light of the foregoing case law. See Doc. 47-1; Doc. 50-2.

"C" and "D"—for its facilities at, among other locations, 8100 South Walker Avenue, in Oklahoma City, Oklahoma. See id ¶ 4. Building "C," which OCOM leases in its entirety, "houses the inpatient and surgical rooms[.]" Id. at 2, ¶ 6. OCOM only leases part of the first floor of Building "D" and uses that space for general business and administrative purposes. See id. ¶ 7.

Thomas was hired by OCOM in 2006[5] as director of housekeeping, see Deposition of Rena Thomas (Vol. I) at pp. 42-44 (February 21, 2017)(hereafter "I Thomas Deposition"), and in that position, she "received merit pay increases[6] and awards for outstanding employee." Affidavit of Rena Thomas (August 11, 2017) at p. 1, ¶ 3 (hereafter "Thomas Affidavit").

During her employment, Thomas denounced what she perceived to be a hostile work environment in "B[uilding] C[.]" Doc. 48-2 at 1; e.g., I Thomas Deposition at p. 53, lines 19-25; id. at p. 58, lines 16-18; id. at 60, lines 14-24. On August 22, 2012, Thomas submitted "her first [written] complaint[.]" Doc. 47 at 5. She drafted an email that was addressed to Steve Hendley, an OCOM regional vice president, see Doc. 47-2, and sent to Hendley, Jeff Bibb, her OCOM supervisor, and Sherry Wagner, OCOM's human resources director.

The subject line of the email read "Racism, Hostile work environment[,]" id. at 1, and Thomas advised in the body of her message that "[s]ince our last conversation on August 17, 2012 I have decided to just start collecting evidence of all of the things that

---

[5]Compare Doc. 32 at 2, ¶ 1 (hired January 8, 2006), with Affidavit of Rena Thomas (August 11, 2017) at p.1, ¶ 2 (hired July 8, 2005)(hereafter "Thomas Affidavit").

[6]Thomas received a merit raise of 2%, effective January 12, 2013, which made her hourly rate $18.05. See Doc. 32-5.

ha[ve] been going on." Id. She objected to what she believed to be "out and out racism[,]" id. at 2, and "the unfairness . . . all the black housekeepers[,]" id., had experienced, "especially since Jo Wyer ("Wyer")[, OCOM's director of nursing,] came . . . ." Id. at 1.

In particular, Thomas complained that Wyer, a Caucasian, had referred to another housekeeper as "'[t]he big black one[,]'" id. at 2,[7] and that she (Thomas) had been treated less favorably than Wyer's son, Jeremy Wyer, who, according to Thomas "sit[s] around consistently." Id. at 1. Thomas also advised Hendley, Bibb and Wagner in the email that they "could never know how we feel being Black People but try to imagine we work hard [and] all we get is complaints[.]" Id. She wrote: "Jennifer Phillips does nothing and they say she is the best housekeeper ever!" Id.[8] Finally, Thomas commended Bibb because he had "tried to address [these] issues[,]" id. at 2,[9] but had "g[otten] nowhere!" Id.[10]

OCOM was "struggling [to] keep[ ] . . . its janitorial department staffed[,]" Deposition of Mike Kimzey (May 2, 2017) at p. 18, lines 12-13, and it decided to "eliminate[ ] its entire

---

[7]Thomas has conceded that after she sent the email, she was unaware of any further similar comments made by Wyer. See I Thomas Deposition at p. 75, line 18 to p. 76, line 1.

[8]Phillips resigned shortly thereafter, see id. at pp. 59-60, so any issues related to Phillips became moot.

[9]Thomas and Bibb talked to OCOM's human resources personnel about her complaints, see id. at p. 58, lines 16-23, and "[o]nce [she] . . . started complaining[, she] . . . got a lot of flack from everybody." Id. at p. 60, lines 11-13.

[10]Thomas has submitted the transcript of a conversation that allegedly occurred between Bibb and Thomas. See Doc. 48-3. During that conversation, Thomas repines: "I ain't going to stand by and take it, because I'm sick of the stuff that go on at OCOM." Id. at 4, lines 8-10. "[I]t's like they picking on us. And we're black. And they say they watching you. They watching you. How do think that make us feel as black people." Id. at 7, lines 4-7. Bibb reportedly tells Thomas: "Let's do this. Let's lay low. Let some time go by[,]" id. at 2, lines 4-5; "Let's play . . . the game." Id. line 8. Bibb further advises Thomas: "I'm with you. Trust me." Id. at 3, line 24.

housekeeping department[.]"[11]   Kimzey Affidavit at 2, ¶ 10.[12] Pursuant to that decision, OCOM began to negotiate with Jan-Pro, which sells franchises that conduct commercial cleaning services.

On August 7, 2013, Thomas together with two other members of OCOM's housekeeping staff, Jerome Morgan, a Black male, and Jennifer Hartley, a Caucasian female,[13] met with Tony Craig, Jan-Pro's owner, Mike Kimzey, OCOM's chief executive officer, Bibb and Wagoner to engage in "'an initial conversation[,]'" Doc. 48-4 at 2

---

[11]E.g., OCOM Answers to Plaintiffs' First Interrogatories, Answer to Interrogatory No. 12[13]: "OCOM asserts it terminated its entire housekeeping department, effective August 30, 2013." See Rule 56(c)(1), supra (party asserting fact cannot be genuinely disputed may support assertion by citing to interrogatory answers).

[12]That decision also affected three other individuals, all Caucasian females, who provided housekeeping services at different OCOM locations. See Kimzey Affidavit at p. 2, ¶¶ 10, 11.

[13]Hartley advised the attendees that she was "'enrolled in school[,]'" Doc. 48-4 at 2 (Transcript at p. 32, line 25), to become a certified nursing assistant ("CNA"). After the elimination of its housekeeping staff, see Kimzey Affidavit at p. 3, ¶ 13, OCOM "transferred [Hartley] . . . to dietary services, her original placement," id., in light of her CNA certification. See id.; Deposition of Jeff Bibb (June 30, 2017) at pp. 51, 53 (hereafter "Bibb Deposition").

(Transcript at p. 31, lines 9-10), about what Craig and Kimzey hoped to "'be a fairly easy transition," id.[14] (Transcript at p. 31, lines 21-22), of employees from OCOM to Jan-Pro.[15]

Jan-Pro and OCOM thereafter entered into a Cleaning Agreement, see Doc. 32-8, dated September 6, 2013. Jan-Pro agreed to provide OCOM with a housekeeping staff, e.g., I Thomas Deposition at p. 138, lines 21-24, by "[c]onvert[ing] all OCOM employees

---

[14]That same day, August 7, 2013, Thomas composed an email to herself, the subject line of which reads: Retaliation. See Doc. 32-6. The email is unfinished, ends abruptly and lacks other recipients. It reads

> You really showed me and the rest of the housekeeping unit what you truly think about us. I have talked to everyone I could think of in Administration to try to get some help. But I have had a band aid[ ] put on everything or to put it better swept under the rug! I understand how we suppose to be thankful just to have a job not matter the injustices you must continue to endure. I did send a letter around Aug. 12, 2012 . . . . My letter then talked about the hostile racist environment we are forced to keep putting up with. But I love working here and our work speaks for itself it shows. But on Aug. 1, 2013 another blow sat me[,] Jerome Morgan and Jennifer from inpatient housekeeping down and want us to work for the housekeeping contract company . . . with no benefits, extreme drop in pay, and expect us to just suck it up. Their policy is that we give them some type of notice if we plan to leave so why can't we be given the same opportunity at least tell us the plans and give us a chance to think about it or even

Id. But see I Thomas Deposition at p. 126, line 24 ("Everything stayed the same."); id. at p. 127, lines 2-3 ("Q. Did your rate of pay change? A. It did not.").

[15]The meeting was recorded, and Thomas has submitted several pages of the transcript of that recording. See Doc. 48-4. During the meeting, Kimzey, speaking to Thomas, Morgan and Hartley, stated, "'[Y]ou three guys carry the load[.]'" Id. at 1 (Transcript at p. 3, lines 16-17). He acknowledged that "'there's a lot of misconceptions about moving to Jan-Pro.'" Id. (Transcript at p. 3, lines 22-23). Craig told Thomas, Morgan and Hartley that Jan-Pro was "'excited . . . about the possibility and opportunity to have you guys employed with Jan-Pro[,]'" id. (Transcript at p. 4, lines 3-5), and he advised that OCOM had "'envisioned . . . having you guys as part of the team and [had asked whether Jan-Pro] could . . . transition you to employees in a manner in which you're compensated the same, benefits were provided, things of that nature.'" Id. (Transcript at p. 4, lines 9-13). Thomas conceded during the meeting, "'What you [are] saying sounds just wonderful[,]'" id. (Transcript at p. 29, lines 18-19), but she asked for documentation regarding her employment. Craig advised that salary and vacation information would be forthcoming and that Jan-Pro had an employee handbook, which would be provided.

to Jan-Pro employees and add[ing] four staff member[s] for a total for six people working 40 hours per week." Doc. 32-8 at 6.[16]  The Cleaning Agreement read in relevant part:

(1) OCOM "agrees to contract Jan-Pro to perform cleaning services under the dual direction of OCOM and Jan-Pro management[,]" id. at 8;

(2) "Jan-Pro will provide all labor and supervision," id.;

(3) "[a]ll existing OCOM employees w[ill] continue to be compensated by Jan-Pro . . . at their existing hourly rate[,]" id. at 6;

(4) Jan-Pro will "cover 100% of their benefits (eligible after 90 days)[,]" id.;

(5) "[b]ased on [Jan-Pro's] . . . annual agreement with OCOM, each employee w[ill] be locked into their hourly rate for the first 12 months.  Each employee w[ill] also have to agree [Jan-Pro's] . . . policy for holidays and vacation time[,]" id.;

(6) "Thomas [will be] billed at $23.51/h[ou]r[,]" id.; and

(7) Thomas will also receive "[a]dditional compensation for working night and weekend shifts . . . [and] a differential of $1.20 per hour for night shift and $1.80 per hour for weekends." Id.

Pursuant to that contract, Thomas completed a form entitled "Resignation/ Termination," see Doc. 32-1, on August 29, 2013, wherein she acknowledged that the last day she would work for OCOM would be August 30, 2013, see id. at 1, and that her employment with OCOM terminated, effective August 31, 2013. See id. at 3.

On September 1, 2013, Thomas became employed by Jan-Pro as "manager of the janitorial crew[,]" Deposition of Tony Craig (May 2, 2017) at p. 28, lines 15-16 (hereafter

---

[16]Four of the six were Thomas, Morgan, Lee Bledsoe and Romerio Robertson, all African Americans.  See Doc. 32-8 at 6; Craig Deposition at p. 16, lines 4-12.

"Craig Deposition"), and assigned to work in Building "C."  See I Thomas Deposition at p. 159, line 13.  She was again tasked with establishing the housekeeping staff's work schedules, see Craig Deposition at p. 28, lines 17-19, and in fact, according to Thomas, "[e]verything[, including her title,] stayed the same.  The only thing that changed was that [she] . . . was now working for Jan-Pro.  That was it."  I Thomas Deposition at p. 126, line 24 to p. 127, line 1.[17]

Thomas' daughter, Krystal Thornton, was terminated from her employment with OCOM either August 13 or August 14, 2015, and on the latter date, Thomas entered Building "D" to retrieve her daughter's personal items.  Thomas had entered Building "D" during her employment with OCOM and, thereafter, with Jan-Pro[18] and to perform contract cleaning in "a little section of Building 'D' for," id. at p. 148, line 5, for Gabriel Pittman, M.D.[19]

On that day, Thomas greeted the receptionist, e.g., id. at p. 166, line 12, and advised Beth Lynn, then an OCOM manager, that she had "com[e] to get Krystal's things."  Id. line 13.  While Thomas was in the process of doing that, Lynn "came out of . . . [her]

---

[17]While Thomas's rate of pay did not change when she became employed by Jan-Pro, see I Thomas Deposition at p. 127, lines 2-3, certain benefits—"PTO and bereavement," id. line 17, as well as "the amount of bonuses . . . and how many times [she] . . . got them a year," id lines 20-21, did.  Eventually, her rate of pay increased "maybe by 50 cents or so."  Id. at p. 141, lines 16-17.

[18]Even though Thomas was not assigned to clean OCOM's business office located in Building "D," see id. at p. 165, lines 1-3, she had, on occasion, been "asked to do . . . different [housekeeping] things in th[at] . . . office."  Id. lines 3-4; e.g., id. lines 7-12; id. at p. 172, line 24 to p. 173, line 24.

[19]Thomas, in fact, had a key to Building "D," see id. at p. 159, lines 23-24, through her contract with Dr. Pittman.  See id. at pp. 159-160.

office, and . . . just started screaming at . . . [Thomas]." Id. at p. 167, lines 20-21.[20]

Thomas "put [down] the things [she had retrieved from her daughter's desk] . . . and . . .

left." Id. at p. 171, lines 13-14.

Bibb "received a call[21] that . . . [Thomas] was over in [B]uilding 'D,' which is

[OCOM's] business office[,]" Deposition of Jeff Bibb (June 30, 2017) at p. 69, lines 5-6

(hereafter "Bibb Deposition"), and "was in an area that she really shouldn't be in." Id. line

7. The caller reported that Thomas, while "trying to retrieve her daughter's things[,]" id.

line 8, "was shaking scissors at an employee[,]" id. line 9—an accusation that Thomas

has denied, see Thomas Affidavit at p. 4, ¶ 20, in a "[t]hreatening[,]" Bibb Deposition at p.

70, line 10, manner.

Bibb "walked across the street[,]" id. at p. 71, line 9, to Building "D," went in the

door[,]" id. line 10, and observed "a lot of people [who] were upset." Id. lines 11-12. He

"tried to calm them down[,]" id. line 12; e.g., id. at p. 74, line 7, and "had them lock the

door that . . . [Thomas] apparently came in." Id. at p. 71, lines 17-18;[22] e.g., id. at p. 74,

lines 7-8. Bibb could not "believe this[,]" id. at p. 70, line 17, had occurred. "It was kind

---

[20]Lynn did not refer to Thomas' race or ethnicity during their encounter. See id. at p. 172, lines 14-17.

[21]Bibb explained that he was called, even though Thomas was no longer an OCOM employee, "[b]ecause they wanted [him] . . . to come over to . . . make sure she left[,]" Bibb Deposition at p. 73, lines 12-13, and because he "was going to need to call . . . [Craig] and explain to him what had happened." Id. lines 14-15.

[22]According to Bibb, the area of the building in which the incident occurred "has a lot of protected patient information[,]" id. at p. 71, lines 21-22, and was accessible through a door that requires a "punch code." Bibb indicated that Thomas had apparently entered through a side door because she did not "have [the punch code] because she[ ] [was] not an . . . [OCOM] employee[,]" id. at p. 72, lines 23-24; in fact, Thomas "shouldn't have even been in that area." Id. lines 24-25.

of . . . a shocker[,]" id. lines 15-16, and was "100 percent out of character[,]" id. lines 19-20, for Thomas to behave this way.

Bibb contacted Craig and told him "that [Thomas] . . . was not allowed back on [OCOM's] . . . premises."[23]   Craig Deposition at p. 16, lines 24-25.[24]   Craig, in turn, contacted Thomas by telephone and repeated what Bibb had told him. Craig believed he "had no options at that point[,]" id. at 18, lines 17-18, since OCOM was a Jan-Pro customer and Bibb had advised him that Thomas "was not allowed on site." Id. line 17. Although Craig "made no attempt to verify [the incident,]" id. at 19, line 8,[25] he terminated Thomas' employment.  See id. at 20, lines 7-9.  He felt he lacked "the authority to tell [Thomas] . . . she [could] go back on . . . [OCOM's] premises[,]" id. lines 13-14: "The client [told] . . . me that she was not allowed on site. . . . [T]herefore, we had to terminate [her employment]." Id. lines 7-9.

During his telephone call with Thomas, Craig did not refer to her race or ethnicity. See I Thomas Deposition at p. 175, line 24 to p. 176, line 2.  In fact, neither Craig nor her

---

[23]The decision to restrict Thomas' access to OCOM property was made after consultation with Amy Taylor, OCOM chief financial officer, and Kimzey. See id. at p. 75, lines 10-17.

[24]Bibb told Craig, "I can't allow . . . [Thomas] back in our buildings." Id. at p. 74, lines 12-13. He asked Craig to "please place her somewhere else," id. line 15, because "she can't come back[,]" id. line 16, and "shouldn't be in our . . . property." Id. lines 24-25.

[25]Craig testified that the incident, as reported to him by Bibb,

had to do with a disruption that occurred when . . . [Thomas] went to pick up her daughter's belongings. And that she was entering a secured area. And there was a conflict that occurred at the time. Between . . . an OCOM employee . . . and [Thomas] . . . regarding entering that secured area. And that . . . [she] caused a disruption and that the authorities were called.

Craig Deposition at p. 21, lines 16-24.

Jan-Pro supervisor, Julius Stanfield, had ever referred to her race while she was employed by Jan-Pro. See id. at p. 176, lines 3-6; id. lines 19-22.

According to Thomas, she returned to Building "D" the next day—August 15, 2015—to clean Dr. Pittman's office and has continued to do so for the last two years. See Thomas Affidavit at p. 4, ¶ 22.[26]

On September 24, 2015, Thomas signed a Charge of Discrimination ("Charge") that was filed with the Equal Employment Opportunity Commission ("EEOC"). See Doc. 32-10. She named Jan-Pro as the "employer . . . that [she] believe[d] [had] discriminated against [her] . . . or others[,]" id. at 1 (capitalization deleted), identified the types of discrimination to which she had been subjected as "race" and "retaliation," id. (capitalization deleted),[27] and listed "08-14-2015" as both the "earliest" date and the "latest" date the discrimination had occurred. See id. (capitalization deleted).

In describing "the particulars[,]" id. (capitalization deleted), of that discrimination, Thomas wrote:

> I. I started working as a house-keeping manager for Jan-Pro in or around March 2012.[28]  The facility where I performed my duties was called . . . [OCOM].

---

[26]According to Bibb, Building "D" is divided into sections, and Thomas "clean[s] ['some doctor's offices[,]' Bibb Deposition at p. 73, line 4,] that were upstairs." Id. lines 4-5. He "believe[s] she still may do that[,]" id. lines 7-8, but emphasized in his deposition that "[s]he shouldn't have been in th[e] area [near the manager's office] . . . because she doesn't clean that area." Id. lines 8-9.

[27]In the EEOC Intake Questionnaire ("EEOC Questionnaire") that Thomas completed on September 24, 2015, see Doc. 48-8, Thomas marked as "the reason (basis) for . . . [her] claim of employment discrimination[,]" id. at 2, the following:  race, religion, retaliation and genetic information (genetic services, meaning counseling, education or testing). See id.

[28]The EEOC Questionnaire from which the information for the EEOC Charge was taken indicates that Thomas was hired on August 29, 2013. See Doc. id. at 1.

II. I originally worked for . . . [OCOM] until I made a complaint of racial discrimination in August 2012.   Immediately after which, I was . . . subcontracted to Jan-Pro, a janitorial service, but still held the same title, duties and responsibilities as if I were directly working for OCOM.  [I,] . . . and other members of my protected class, have been subjected to a hostile work environment for years, but no one will say anything for fear of retaliation and losing their jobs.  I often told my supervisor with Jan-Pro (Tony Craig, WM) about discrimination in that facility (OCOM), but he had made no good faith effort to rectify my issues.  On August 14, 2015, I received a phone call telling me that I was fired.  I have no negative work history and see no reason for my discharge but for the fact that . . . Craig doesn't want me to complain about discrimination.

III. I believe that I have been discriminated against on the basis of my race, Black and that I have been retaliated against for my involvement in a protected activity[.]

Id. at 1-2.

The EEOC issued its Dismissal and Notice of Rights on April 8, 2016.  See Doc. 32-11.  Included with that paper was a letter addressed to Thomas that read in part:

As you were previously informed in a memorandum dated March 25, 2016, the evidence provided is insufficient on which to proceed with the investigation.  You were provided with time to submit additional evidence in support of the charge, but failed to do so.

Id. at 2.

OCOM has first argued that Thomas has failed to exhaust her administrative remedies and that it is therefore entitled to dismissal of Thomas' Title VII and OADA[29] claims against it.[30]

---

[29]The OADA, like Title VII, requires a plaintiff to exhaust her administrative remedies through the filing of a charge of discrimination.  E.g., Tolbert v. Ean Services, LLC, 2016 WL 796096 *3 (N.D. Okla. February 26, 2016); 25 O.S. § 1350(B)(to have standing to allege discrimination from employment-related matter, aggrieved party must within 180 days from last date of alleged discrimination, file charge of discrimination with Oklahoma Attorney General's Office of Civil Rights Enforcement or EEOC).

[30]To the extent, OCOM has contended that exhaustion of remedies is jurisdictional, see Doc. 32 at 6, the Court notes that the Tenth Circuit has "called into question . . . [the] circuit's Title

In her complaint, Thomas alleged that she "ha[d] exhausted her administrative remedies by timely filing a Charge of Discrimination with the EEOC on or about September 14, 2015 and by receiving her right to sue letter . . . on or about April 8, 2016." Doc. 1 at 2, ¶ 5. In its answer, OCOM responded to that allegation by asserting that

> it was never put on notice of the alleged EEOC Charge of Discrimination and/or right to sue letter . . . . Any claim that OCOM has violated any rights protected by the EEOC, [Thomas] . . . is time barred from asserting those against OCOM and has failed to follow the administrative predicate to filing this lawsuit. OCOM seeks dismissal of these claims.

Doc. 6 at 3, ¶ 6.[31]

First, while Thomas' EEOC Charge indicates that she has "been subjected to a hostile work environment for years," Doc. 32-10 at 1, she checked only the boxes marked "Race" and "Retaliation."  See id.[32]  Moreover, rather than checking the box for

---

VII jurisdictional cases." Arabalo v. City of Denver, 625 Fed. Appx. 851, 864 (10th Cir. 2015) (citing Gad v. Kansas State University, 787 F.3d 1032, 1039-40 (10th Cir. 2015))(cited pursuant to Tenth Cir. R. 32.1).  "Even if administrative exhaustion is only a condition precedent to suit," id., as case law now suggests, the Court is still required to determine whether that condition has been met in this instance. E.g., Wickware v. Johns Manville, 676 Fed. Appx. 753 (10th Cir. 2017) (even if exhaustion not jurisdictional, it is condition precedent to suit)(cited pursuant to Tenth Cir. R. 32.1).

[31]The federal rules provide that "a party must . . . state in short and plain terms its defenses to each claim asserted against it[,]" Rule 8(b)(1)(A), F.R.Civ.P., and "affirmatively state any . . . affirmative defense[.]"  Rule 8(c)(1), supra.  In doing so, the party gives notice to the opposing party of the defense and the grounds upon which its rests.
   Even though OCOM did not include exhaustion of remedies in its laundry list of affirmative defenses, see Doc. 6 at 12-15, the Court finds OCOM has sufficiently alleged the same in its answer and that Thomas had sufficient notice of the nature of OCOM's contention regarding exhaustion for purposes of Rule 8, supra.

[32]"The failure to mark a particular box creates a presumption that the charging party is not asserting claims represented by that box." Jones v. U.P.S., Inc., 502 F.3d 1176, 1187 (10th Cir. 2007)(citation omitted).  This "presumption may be rebutted, however, if the text of the charge clearly sets forth the basis of the claim." Id. (citation omitted).

"[c]ontinuing [a]ction," id., she indicated that August 14, 2015, was both the "[e]arliest" and the "[l]atest" "[d]ate(s) [the] discrimination took place." Id. (capitalization deleted).

While an aggrieved employee's descriptive statement in her charge regarding "the particulars," id. (capitalization deleted), of her claims may provide additional information regarding the nature of the alleged discrimination and the identity of the entity that allegedly discriminated against her, Thomas' Charge focused only on her termination on August 14, 2015: "I . . . see no reason for my discharge but for the fact that . . . Craig doesn't want me to complain about discrimination." Id.

Thomas' Title VII and OADA claims against OCOM are "'limited by the scope of the administrative investigation that can reasonably be expected to follow [Thomas' EEOC] . . . [C]harge of [D]iscrimination . . . .'" Jones v. U.P.S., Inc., 502 F.3d 1176, 1186 (10th Cir. 2007)(quotation omitted)(further citation omitted). This is so because in Title VII and OADA cases, "[e]xhaustion . . . serves the important purposes of 'protect[ing] employers by giving them notice of the discrimination claims being brought against them and providing the EEOC . . . with an opportunity to conciliate th[ose] claims.'" Gad v. Kansas State University, 787 F.3d 1032, 1040 (10th Cir. 2015)(quotation omitted). The EEOC charge must therefore be "'sufficiently precise to identify the parties, and to describe generally the action or practices complained of.'" Wickware v. Johns Manville, 676 Fed. Appx. 753, 768 (10th Cir. 2017)(quoting 29 C.F.R. § 1601.12(b)); e.g., Jones v. Needham, 856 F.3d 1284, 1290 (10th Cir. 2017)(given exhaustion's goals, EEOC charge must contain the general facts concerning the discriminatory actions later alleged in lawsuit).

To determine whether OCOM had sufficient notice in this case, the Court has examined those factors deemed relevant by the Tenth Circuit in determining whether a plaintiff can proceed against a party named only in the body of an EEOC charge.  See Romero v. Union Pacific R.R., 615 F.2d 1303 (10th Cir. 1980).  Those factors include

> "1) whether the role of the unnamed party could through reasonable effort by the complainant be ascertained at the time of the filing of the EEOC complaint; 2) whether, under the circumstances, the interests of a named [defendant] are so similar as the unnamed party's that for the purpose of obtaining voluntary conciliation and compliance it would be unnecessary to include the unnamed party in the EEOC proceedings; 3) whether its absence from the EEOC proceedings resulted in actual prejudice to the interests of the unnamed party; 4) whether the unnamed party has in some way represented to the complainant that its relationship with the complainant is to be through the named party."

Id. at 1312 (quoting Glus v. G.C. Murphy Co., 562 F.2d 880, 888 (3d Cir. 1977)).[33]

---

[33]To the extent Thomas has argued that OCOM and Jan-Pro are "joint employers" and/ constitute a "single employer" such argument fails.  To prevail on her Title VII and OADA claims, Thomas "must first prove the defendant [under consideration] was her employer."  Knitter v. Corvias Military Living, LLC, 758 F.3d 1214, 1225 (10th Cir. 2014)(citations omitted).  Two tests are arguably applicable in this instance to determine whether OCOM and Jan-Pro, as Thomas has argued, both qualify as her employer.

"Under the joint employer test, two entities are considered joint employers if they 'share or co-determine those matters governing the essential terms and conditions of employment.'"  Id. at 1226 (quoting Bristol v. Board of County Commissioners, 312 F.3d 1213, 1226 (10th Cir. 2002) (en banc)(further quotations omitted)).  Thus, OCOM as well as Jan-Pro may be considered Thomas' employer, "if they both 'exercise significant control over the same employees.'"  Id. (quotations omitted). That is to say, "'[a]n independent entity with sufficient control over the terms and conditions of employment of a worker formally employed by another is a joint employer within the scope of Title VII.'"  Id. (quoting Sizova v. National Institute of Standards and Technology, 282 F.3d 1320, 1330 (10th Cir. 2002)(further quotations omitted)).  "'Most important to control over the terms and conditions of an employment relationship is the right to terminate it under certain circumstances. . . .'"  Id. (quoting Bristol, 312 F.3d at 1219).  "Additional factors [the] [C]ourt[ ] [may] consider for determining control under th[is] . . . test include the ability to 'promulgate work rules and assignments, and set conditions of employment, including compensation, benefits, and hours; . . . day-to-day supervision of employees, including employee discipline; and . . . control of employee records, including payroll, insurance, taxes and the like.'"  Id. (quotations omitted).

According to Thomas, "OCOM's plan was to 'transition' African American members of the housekeeping staff to . . . Jan-Pro . . . but retain control over them . . . ."  Doc. 48 at 6.  Thomas was given no real choice regarding the 'transition' if she wanted to keep her employment, but was repeatedly told her 'job' would be identical, [and] her responsibilities [and co-workers] the same."

As the record establishes, OCOM's role in the events giving rise to her discharge was clearly known to Thomas at the time she filed her EEOC Charge. Moreover, Thomas referred to OCOM in her EEOC Intake Questionnaire, see Doc. 47-8;[34] she has not explained why she did not also identify OCOM in her EEOC Charge as an entity that

_Id_. The only difference would be that "[h]er paychecks would just come from[,]" _id_., Jan-Pro. See Craig Deposition at p. 43, lines 1-4.

While arguably Thomas "performed cleaning services under the dual direction of OCOM and Jan-Pro management[,]" Doc. 32-8 at 8, the undisputed evidence in this case is that Jan-Pro had the authority to terminate Thomas' employment; it set her compensation, see Doc. 32-8 at 6, determined her benefits, see _id_., and maintained her employment records. The Jan-Pro Cleaning Systems Employee Handbook, see Doc. 33-4, that Thomas was provided, see III Thomas Deposition at p. 343, lines 9-15, addressed all aspects of Thomas' employment, including Jan-Pro's policies regarding random drug/alcohol screening, work-place harassment and attendance and punctuality. Accordingly, the Court finds Thomas has failed to meet her burden at this stage to show that OCOM was her employer at the time of her discharge.

To the extent Thomas has relied on the "single employer" test, such "test permits 'a plaintiff who is the employee of one entity . . . to hold another entity liable by arguing that the two entities effectively constitute a single employer.'" Knitter, 758 F.3d at 1226 (quoting Bristol, 312 F.3d at 1218). This test differs from the joint employer test "in that the single-employer test asks whether two nominally separate entities should in fact be treated as an integrated enterprise, while the joint-employer test assumes that the alleged employers are separate entities.'" _Id_. at 1226-27 (quoting Bristol, 312 F.3d at 1218).

"Unlike the joint employer test, which focuses on the relationship between an employee and its two potential employers, the single employer test focuses on the relationship between the potential employers themselves." _Id_. at 1227. In applying this test, the Court must "'weigh four factors: "(1) interrelations of operation; (2) common management; (3) centralized control of labor relations; and (4) common ownership and financial control."'" _Id_. (quoting Bristol, 312 F.3d at 1220 (further quotation omitted)). The record is devoid of any evidence regarding these factors; accordingly, Thomas has failed to show a genuine dispute regarding the relationship between OCOM and Jan-Pro that would require submission of this issue to a jury.

[34]In determining whether exhaustion has occurred, courts "typically look to the charge form if one exists.  This is because the charge form, not a previous filing [such as an intake questionnaire,] is given to the employer to notify it of the potential claims against it and ordinarily determines the scope of the EEOC's investigation." Needham, 856 F.3d at 1290 (citation omitted); e.g., Green v. JP Morgan Chase Bank National Association, 501 Fed. Appx. 727, 731 (10th Cir. 2012)(agreeing with Third Circuit in deciding that plaintiff cannot be allowed to transfer allegations mentioned only in intake questionnaire to charge itself)(cited pursuant to Tenth Cir. R. 32.1); _id_. at 731-32 (to permit plaintiffs to reach back to contents of intake questionnaires to expand scope of subsequent lawsuit would, if not eviscerate, then at the very least significantly undermine policies underlying exhaustion requirement).

discriminated and/or retaliated against her or subjected her to a hostile work environment. See Holloman v. Tulsa Gamma Ray, Inc., 2013 WL 4647736 *2 (W.D. Okla. August 29, 2013)(absent explanation, court "is left to assume that . . . [entity] was intentionally not listed").

Thomas has argued that OCOM and Jan-Pro' interests are sufficiently intertwined to satisfy Title VII's notice requirement, and in any event, OCOM was aware of the EEOC proceedings because Jan-Pro forwarded Thomas' EEOC Charge to OCOM. While Jan-Pro offered to keep OCOM apprised of the status of the case, there is no indication that either Jan-Pro or Thomas believed that OCOM's input, or its participation in the EEOC proceedings, was necessary. There is likewise no indication in the record that the EEOC, during its investigation, advised OCOM that there was charge against it, and to that extent, OCOM, if its participation was necessary, has been prejudiced by its absence from those proceedings. Finally, the record is devoid of any evidence that OCOM represented to Thomas that it controlled her employment, but did so through Jan-Pro. Even construing Thomas' EEOC Charge liberally, as she has urged the Court to do,[35] the Court finds the factual allegations in that Charge are not sufficient to identify OCOM as an "the employer" that allegedly discriminated against her on the date of her discharge. It is Thomas' burden to prove that OCOM was her employer at the time the discrimination and retaliation described in the EEOC Charge occurred, e.g., Knitter v. Corvias Military Living, LLC, 758

---

[35]As in this case, EEOC charges are frequently filed without the benefit and assistance of counsel. See Equal Employment Opportunity Commission v. University of New Mexico, 504 F.2d 1296, 1303 (10th Cir. 1974)(charges filed with EEOC by lay complainants, unfamiliar with niceties of pleading, and without assistance of counsel, must be liberally construed).

F.3d 1214, 1225 (10th Cir. 2014)(citations omitted); because she has not done so, her Title VII and OADA claims against OCOM fail as a matter of law. E.g., id.

The Court likewise finds that the factual allegations in Thomas' EEOC Charge are inadequate to show "treatment in manner or degree sufficient to allege a hostile work environment." Mitchell v. City and County of Denver, 112 Fed. Appx. 662, 668 (10th Cir. 2004)(cited pursuant to Tenth Cir. R. 32.1). The Court's inquiry at this stage "is whether the facts alleged [in Thomas' EEOC Charge[36]] are 'sufficiently related to the claim [made in [Thomas'] . . . complaint] such that those facts would prompt an investigation of th[at] claim.'" Needham, 856 F.3d at 1290 (quotation omitted). The Court finds that Thomas' Charge failed to alert either OCOM or Jan-Pro that Thomas, in addition to complaining about Jan-Pro's decision to discharge her, was also contending that OCOM and Jan-Pro had subjected her to a hostile work environment based on race and national origin.[37] Thomas therefore did not exhaust her administrative remedies before pursuing any claims against OCOM under Title VII and the OADA and further, did not exhaust her hostile work environment claims against Jan-Pro under Title VII and the OADA. Such claims should be dismissed.[38]

---

[36]See id.

[37]Thomas' bald statement her EEOC Charge that she has "been subjected to a hostile work environment for years," Doc. 32-10 at 1, is not sufficient. E.g., Mitchell, 112 Fed. Appx. at 668 (EEOC charge must contain factual allegations of treatment in manner or degree sufficient to allege a hostile work environment).

[38]Whether framed as a jurisdictional matter or a condition precedent to suit, it is Thomas' burden to demonstrate that she has met Title VII and the OADA's exhaustion requirements. E.g., Gad, 787 F.3d at 1041 (condition precedent to suit is "'burden for plaintiffs to carry'"); Arabalo, 625 Fed. Appx. at 860 (plaintiff's "need to disclose [to EEOC] her bases supporting her alleged claim is a condition precedent to her suit, not a mere affirmative defense for which the defendant must bear the burden").

Even assuming that Thomas had exhausted her hostile work environment claims for purposes of Title VII and the OADA against Jan-Pro and OCOM, the Court finds that these claims as well as Thomas' section 1981 hostile work environment claims against Jan-Pro and OCOM[39] fail as a matter of law.

Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to h[er] . . . terms, conditions, or privileges of employment, because of such individual's race . . . or national origin[.]"  42 U.S.C. § 2000e-2(a)(1).  Section 1981, for purposes of this claim, provides that "[a]ll persons . . . shall have the same right . . . to," id. § 1981(a), "the enjoyment of all benefits, privileges, terms, and conditions of the [employment] . . . relationship." Id. § 1981(b).[40]  The OADA, on which Thomas has also relied, provides that "[i]t is a discriminatory practice for an employer . . . to discriminate against an individual with respect to . . . the terms, conditions, privileges or responsibilities of employment, because of race . . . [or] national origin[.]"  25 O.S. § 1302(A)(1).[41]  "An employer violates [these statutes] . . . when it allows 'a hostile

---

[39]While section 1981 does not require exhaustion, e.g., Aramburu v. Boeing Co., 112 F.3d 1398, 1410 n.9 (10th Cir. 1997), it does require that any hostile work environment claims be brought "within four years of the alleged conduct." Aman v. Dillon Companies, Inc., 645 Fed. Appx. 719, 723 (10th Cir. 2016)(citing 28 U.S.C. § 1658; Tademy v. Union Pacific Corp., 614 F.3d 1132, 1152 (10th Cir. 2008))(cited pursuant to Tenth Cir. R. 32.1).  Thomas' employment with OCOM ended at the latest on August 31, 2013.  Thomas' complaint was filed on July 7, 2016; accordingly, Thomas' section 1981 hostile work environment claim against OCOM is timely.

[40]Both section 1981 and Title VII authorize a plaintiff to bring a claim for hostile work environment based on unlawful race and national origin discrimination, and "[t]he same substantive standards apply to a hostile work environment claim regardless of whether the plaintiff has brought it under [section] 1981 or Title VII." Lounds v. Lincare, Inc., 812 F.3d 1208, 1221 (10th Cir. 2015)(citing Aramburu, 112 F.3d at 1410)(further citation omitted).

[41]"[C]laims under the OADA are evaluated using the same standards as claims under Title VII, and a claim that fails under Title VII will also fail under the OADA." Cunningham v. Skilled Trade Services, Inc., 2015 WL 6442826 *3 (W.D. Okla. October 23, 2015)(citations omitted).

work environment based on race or national origin discrimination.'" Unal v. Los Alamos Public Schools, 638 Fed. Appx. 729, 735 (10th Cir. 2016)(quoting Hernandez v. Valley View Hospital Association, 684 F.3d 950, 957 (10th Cir. 2012)).

"To carry her prima facie burden under the hostile-work-environment framework, [Thomas] . . . must show '(1) she is a member of a protected group; (2) she was subject to unwelcome harassment; (3) the harassment was based on [her race and] [national origin]; and (4) due to the harassment's severity or pervasiveness, the harassment altered a term, condition, or privilege of [her] employment and created an abusive working environment.'" Id. at 735-36 (quoting Lounds v. Lincare, Inc., 812 F.3d 1208, 1222 (10th Cir. 2015)).

In describing the conduct that gives rise to her claims of hostile work environment based on race and national origin against Jan-Pro and OCOM, Thomas has asserted the following:

(1) Wyer "refer[red] to one of . . . [the] housekeepers as the 'Big Black One[,]'" Thomas Affidavit at 2, ¶ 4(a);

(2) "[c]omplaints about [an] African American housekeeper eating snacks resulting in a separate refrigerator being bought to keep housekeeper snacks[,]" id. ¶ 4(b);

(3) "[l]earning about the Director of Nursing reviewing security camera footage in an effort to question . . . Thomas' work[,]" id. ¶ 4(c);

(4) "having to come in and do other people's work[,]" I Thomas Deposition at p. 53, lines 24-25; and

(5) complaints that Building "C" was not getting cleaned. See id. at p. 76, lines 8-23.

Thomas has further asserted that even after she became a Jan-Pro employee, see I Thomas Deposition at p. 137, lines 13-16, Bibb was "always telling [her] . . . , 'I'm always watching you. They[—OCOM's administration, id. at p. 138, line 4—]are watching you. Watch what you do. Watch everything you say.'" Id. at p. 137, lines 2-4; e.g., id. line 9 ("'Play the game.'").

During her deposition, Thomas was asked the following questions, and she gave the following answers about unwelcome harassment, if any, at Jan-Pro:

Q. . . . . And your tenure with Jan-Pro, was it on the good spectrum or the

bad spectrum of things?  How would you describe it?

A.  Good.

Deposition of Rena Thomas (Vol. II) at p. 308, lines 6-9 (March 14, 2017)(hereafter "II Thomas Deposition").

Q. Any complaints about your employment with Jan-Pro . . . [,] about things

. . . that you believe were unfair or discriminatory?

A.  No.

Deposition of Rena Thomas (Vol III) at p. 355, lines 7-12 (March 16, 2017)(hereafter "III Thomas Deposition").  Thomas, in fact, when asked to give an "example of any treatment . . . [she] felt was discriminatory when . . . working for Jan-Pro," I Thomas Deposition at p. 141, lines 6-8, answered:  "I can't say that I can."  Id. line 9.[42]  She further answered in the negative when asked whether she had any "complaints about [her] . . . employment

---

[42]Cf. I Thomas Deposition at p. 136, lines 9-19 ("Q.  The complaints you made to . . . Craig, were those about the conduct you received . . . while you were working at OCOM as an employee? A.  Absolutely.  Q.  Did you feel that you were still subjected to similar treatment while working for Jan-Pro?  A.  Absolutely.  Q.  Who did you feel was subjecting you to that type of treatment?  A.  OCOM.").

with Jan-Pro before [August 14, 2015] . . . ." III Thomas Deposition at p. 356, lines 18-19.

"To survive summary judgment on a claim of [race- or] national-origin-based hostile work environment, a plaintiff must show harassment stemming from animus toward her [race or] national origin." Unal, 638 Fed. Appx. at 736 (citing Hernandez, 684 F.3d at 960). Because the record is devoid of such evidence as to Jan-Pro, the Court finds this defendant is entitled to judgment as a matter of law on Thomas' Title VII, section 1981 and OADA hostile work environment claims.

As to OCOM, Thomas has shown the first element of her prima facie case: she belongs to a protected group. The Court has further assumed, for purposes of OCOM's motion, that Thomas has shown a genuine issue of fact with regard to the second and third elements of her prima facie case: that the harassment to which she was subjected during her employment from 2006 to 2013 was unwelcome and that she "'was targeted for harassment because of [her] . . . race[ ] or national origin.'" Herrera v. Lufkin Industries, Inc., 474 F.3d 675, 680 (10th Cir. 2007)(quotation and further citation omitted).

The Court finds, however, that Thomas has failed to establish a genuine dispute with regard to the fourth element of her prima facie case and that her failure to do so is dispositive of her hostile work environment claims against OCOM under Title VII, section 1981 and OADA.

"'Pervasiveness and severity are independent and equal grounds' upon which a plaintiff may establish this element of [her] . . . hostile environment claim." Tademy v. Union Pacific Corp., 614 F.3d 1132, 1144 (10th Cir. 2008)(quotation and further citation omitted). To survive OCOM's request for summary judgment, Thomas was required to

"'show that a rational jury could conclude that . . . [her] workplace [was] . . . permeated with discriminatory intimidation, ridicule, and insult, that [was] . . . sufficiently severe or pervasive to alter the conditions of [her] . . . employment and create an abusive working environment[.]'"  Herrera, 474 F.3d at 680 (quotation and further citation omitted).

In determining whether conduct is sufficiently severe or pervasive, the Court must examine "all the circumstances[,]" Harris v. Forklift Systems, Inc., 510 U.S. 17, 23 (1993), and consider such factors as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. The Court must further "'consider the work atmosphere both objectively and subjectively[.]'" Tademy, 614 F.3d at 1144 (quotation omitted).  To be actionable, the harassment must be objectively hostile, "'judged from the perspective of a reasonable person in [Thomas'] . . . position,'" O'Shea v. Yellow Technology Services, Inc., 185 F.3d 1093, 1098 (10th Cir. 1999)(quotation omitted), and must be subjectively perceived by the victim to be abusive.

Viewing the evidence in the light most favorable to Thomas, the Court finds that the incidents, comments and complaints she has described in her affidavit and deposition, when viewed objectively, are not so severe to establish a hostile environment. And, while Thomas has complained that Bibb's statements "made . . . [her] feel very uncomfortable[,]" I Thomas Deposition at p. 137, line 6, and that it was "[j]ust like walking on egg shells," id. line 11, "behavior capable of causing mere discomfort is [not] necessarily capable[, and particularly, in this case,] of 'alter[ing] the conditions of [a] victim's employment and creat[ing] an abusive working environment.'"  McElroy v. American Family Insurance, 630 Fed. Appx. 847, 850 (10th Cir. 2015)(quoting Morris v.

City of Colorado Springs, 666 F.3d 654, 664 (10th Cir. 2012)(further quotation omitted))(cited pursuant to Tenth Cir. R. 32.1). As the Tenth Circuit has cautioned, "'even incidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe . . . standard.'" Id. (quotation omitted).

In considering the frequency of the conduct about which Thomas has complained, as the Tenth Circuit has emphasized, "'the word "pervasive" is not [simply] a counting measure[.]'" Lounds, 812 F.3d at 1223. However, after examining the evidence in a light most favorable to Thomas and "'concentrat[ing] not on individual incidents, but on the overall scenario,' which is informed by the sum total of those incidents[,]" id. at 1224 (quotation and further citations omitted), the Court finds that Thomas' workplace was not so polluted with harassing conduct that was humiliating, offensive or insulting.

The Court is mindful "that the severity and pervasiveness evaluation is particularly unsuited for summary judgment because it is "'quintessentially a question of fact.'"" O'Shea, 185 F.3d at 1098 (quotation and further citation omitted). The Court is equally mindful, however, that "this issue [in proper circumstances may be resolved] at the summary judgment stage." McElroy, 630 Fed. Appx. at 849 (citations omitted).

In this instance, the Court finds that Thomas has failed to present evidence that shows a genuine dispute of material fact regarding the severity and pervasiveness of the harassment as described by Thomas in her affidavit and deposition.[43] Accordingly, the Court finds no reasonable jury could conclude that Thomas' workplace was so permeated

---

[43]See Agassounon v. Jeppesen Sanderson, Inc., 2017 WL 2179105 *2 (10th Cir. 2017) (plaintiff must show more than a few isolated incidents of racial enmity)(cited pursuant to Tenth Cir. R. 32.1).

with discriminatory intimidation or ridicule that was either severe or pervasive enough to alter the conditions of her employment.

The Court has next considered Thomas' claims that she was wrongfully discharged because of her race and national origin in violation of Title VII, section 1981 and the OADA by Jan-Pro and in violation of section 1981 by OCOM (to the extent, if any, OCOM played a role in her termination).[44]   In this connection, Title VII prohibits an employer from "discharg[ing] any individual . . . because of such individual's race . . . or national origin[.]" 42 U.S.C. § 2000e-2(a)(1).[45]   Section 1981 further provides in relevant part that "[a]ll persons . . . shall have the same right . . . to make and enforce contracts, . . . as is enjoyed by white citizens," id. § 1981(a), which "term 'make and enforce contracts[,]'" id. § 1981(b), is statutorily defined to "include[ ] the . . . termination of contracts[.]" Id. The OADA, on which Thomas has also relied, likewise provides that "[i]t is a discriminatory practice for an employer . . . to discharge . . . an individual . . . because of race . . . [or] national origin[.]" 25 O.S. § 1302(A)(1).

---

[44]See n.33, supra.

[45]Title VII recognizes "two categories of wrongful employer conduct . . . . The first type is called . . . status-based discrimination[, which] term is used . . . to refer to basic workplace protection such as prohibitions against employer discrimination[, as in this case,] on the basis of race[ ] . . . or national origin, in hiring, firing, salary structure, promotion and the like. The second type of conduct is employer retaliation on account of an employee's having opposed, complained of, or sought remedies for, unlawful workplace discrimination." University of Texas Southwestern Medical Center v. Nassar, 133 S. Ct. 2517, 2522 (2013)(citing 42 U.S.C. §§ 2000e-2(a), 2000e-3(a)).  Thomas has asserted both types of claims in this lawsuit.

In analyzing Thomas' Title VII, section 1981[46] and OADA[47] wrongful discharge claims, which are grounded solely on circumstantial evidence, the Court has applied the three-part framework developed by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), which, together with subsequent decisions, "'established an allocation of the burden of production and an order for the presentation of proof in . . . discriminatory-treatment cases.'" Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 142 (2000)(quoting St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993)).

Under the McDonnell Douglas burden-shifting approach, a complainant such as Thomas must first make a prima facie showing of race and national origin discrimination, e.g., Bird v. Regents of New Mexico State University, 619 Fed. Appx. 733, 741 (10th Cir. 2015)(cited pursuant to Tenth Cir. R. 32.1),[48] and the Court has assumed without deciding that Thomas has established a prima facie case of race and national origin

---

[46]Discrimination claims under section 1981 are evaluated under the same standards that apply to Title VII discrimination claims. See Carney v. City & County of Denver, 534 F.3d 1269, 1273 (10th Cir. 2008).

[47]See n.41, supra.

[48]"[T]he articulation of a plaintiff's prima facie case may well vary, depending on the context of the claim and the nature of the adverse employment action alleged." Plotke v. White, 405 F.3d 1092, 1099 (10th Cir. 2005)(citations omitted). "[T]o make out a prima facie case of discrimination, a plaintiff must demonstrate 'that (1) the victim belongs to a protected class; (2) the victim suffered an adverse employment action; and (3) the challenged action took place under circumstances giving rise to an inference of discrimination.'" Bird, 619 Fed. Appx. at 741 (quoting EEOC v. PVNF, L.L.C., 487 F.3d 790, 800 (10th Cir. 2007)). "'The critical prima facie inquiry in all cases is whether the plaintiff has demonstrated that the adverse employment action occurred "under circumstances which give rise to an inference of unlawful discrimination."'" Id. (quoting Kendrick v. Penske Transportation Services, Inc., 220 F.3d 1220, 1227 (10th Cir. 2000)(quoting Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981))).

discrimination.[49]  Accordingly, "'the burden shifts to the [employer] . . . to articulate a legitimate, nondiscriminatory reason for its actions.'"  Bird, 619 Fed. Appx. at 741 (quotation omitted).  "This burden is one of production, not persuasion; it . . . 'involve[s] no credibility assessment.'"  Reeves, 530 U.S. at 142 (quoting St. Mary's Honor Center, 509 U.S. at 509).

As stated, Title VII, section 1981 and OADA target the employer, e.g., Knitter, 758 F.3d at 1225 (to prevail, plaintiff must prove defendant was her employer); Frank v. U.S. West, Inc., 3 F.3d 1357, 1361 (10th Cir. 1993)(to establish prima facie case, plaintiffs required to prove that defendant was their employer), and, as stated, the Court finds Thomas "has provided insufficient evidence for a reasonable jury to conclude [OCOM] . . . was her 'employer' [on August 14, 2015, the date she was discharged,] for purposes of Title VII[, section 1981 and the OADA]."  Id.[50]  Accordingly, it is Jan-Pro that has the burden in this instance to set forth a legitimate, nondiscriminatory reason for Thomas' termination, and the Court finds that Jan-Pro has met its burden by offering admissible evidence that Thomas was discharged because Craig believed he lacked "the authority to tell [Thomas that] . . . she [could] . . . go back on [OCOM's] . . . premises[,]" Craig Deposition at p. 20, lines 13-14, and because Jan-Pro "had no cleaning customers that

---

[49]While Thomas need only make a "de minimis showing . . . for a prima facie case of [race and national origin] . . . discrimination[,]" Plotke, 405 F.3d at 1101, under the McDonnell Douglas framework, as the Court has noted, see n.48, supra, the critical element is whether she "'has demonstrated that the adverse employment action occurred "under circumstances which give rise to an inference of unlawful discrimination."'" Bird, 619 Fed. Appx. at 741 (quotations omitted). Although the defendants have argued that Thomas has not done so, the Court has instead focused, as to Jan-Pro, on the nondiscriminatory reasons for terminating Thomas it has offered and Thomas' ability to show that such reasons are pretextual.

[50]Accordingly, OCOM is entitled to judgment as a matter of law on Thomas' Title VII, section 1981 and OADA claims that are grounded on Thomas' alleged wrongful discharge.

[it] . . . could transition her to . . . ." Id. at p. 27, lines 15-17; e.g., id. line 17 (Jan-Pro "did not have [a] place of employment for her"). Such is sufficient for a trier of fact to conclude that Thomas' employment was terminated for legitimate, nondiscriminatory reasons.

Accordingly, the presumption of race and national origin discrimination created by Thomas' prima facie case "simply drops out of the picture[,]" St. Mary's Honor Center, 509 U.S. at 511 (citation omitted), and the burden shifts back to Thomas "to establish a genuine issue of material fact that [Jan-Pro's] . . . reasons were pretextual." Bird v. West Valley City, 832 F.3d 1188, 1201 (10th Cir. 2016). And if Thomas "'presents evidence sufficient to create a genuine factual dispute regarding the veracity of [Jan-Pro's] . . . nondiscriminatory reason[s], [the Court must] . . . presume the jury could infer that [Jan-Pro] . . . acted for a discriminatory reason and must deny summary judgment.'" Jones v. Oklahoma City Public Schools, 617 F.3d 1273, 1280 (10th Cir. 2010)(quotation omitted).

"Evidence of pretext may . . . take a variety of . . . forms." Swackhammer v. Sprint/ United Management Co., 493 F.3d 1160, 1168 (10th Cir. 2007). A plaintiff may show pretext by revealing

> "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for th[ose] . . . reasons."

Oklahoma City Public Schools, 617 F.3d at 1280 (quotation omitted); e.g., Reeves, 530 U.S. at 147 (proof that defendant's explanation is unworthy of credence is one form of circumstantial evidence that is probative of intentional discrimination).

Although Thomas denied in her deposition that Craig had discriminated against her when he terminated her employment,[51] in her response, she has asserted that Jan-Pro's claimed reasons for her discharge are pretextual.[52]  In support of this contention, Thomas has relied the following:[53]

---

[51]See III Thomas Deposition at p. 369, line 24 to p. 370, line 2 ("Q. . . . Do you believe that Craig discriminated against you on the basis of your race when he terminated you?  A. Absolutely not.").

[52]A plaintiff may show pretext by "demonstrat[ing] that . . . [her] employer 'treated . . . [her] differently from other similarly-situated employees[.]'"  Swackhammer, 493 F.3d at 1167 (quotation omitted).  To the extent, if any, Thomas has asserted that Jan-Pro treated Caucasian housekeepers differently from African American housekeepers, the Court finds, without more, that Thomas' subjective belief and speculation that Jan-Pro was arguably biased against African Americans does not support an inference of discriminatory intent or support a claim of pretext. Thomas has presented no evidence that a similarly-situated Caucasian housekeeper brandished scissors in an allegedly threatening manner on a customer's premises and was not terminated or that a similarly-situated Caucasian housekeeper was forbidden from entering one client's premises and transitioned to work for another client at a different location.

[53]During her deposition, Thomas summarized her complaint with Jan-Pro's decision to terminate her employment:

> [I]t was the way I was let go, the way I was fired.  And I just felt like I had no help, . . . just no help in no kind of way.  Just, "Hey, you don't have a job," by telephone and that's it[,]

III Thomas Deposition at p. 354, lines 15-19, "[a]nd I had done nothing." Id. line 21.
In further explaining the reason for this lawsuit against Jan-Pro, Thomas stated:

> I felt like they should have went to bat for me . . . because I was a good employee. I always worked, I did what they needed all the time, and I just felt like they should have . . . asked what's going on instead of just saying, "Hey, they don't want you on the premises, that's it."

Id. line 24 to p. 355, line 6.

(1) Craig failed to investigate the veracity of Bibb's statements, e.g., Craig Deposition at p. 19, line 8 ("I made no attempt to verify . . . [the incident].");[54] and

(2) Thomas was present in Building "D" the day after her termination and "interacted with the very same people . . . Bibb testified were 'scared' [of her] . . . .'" Doc. 48 at 26.

"[I]n assessing [Jan-Pro's] . . . explanations for [Thomas'] . . . termination," West Valley City, 832 F.3d at 1201, the Court must "'examine the facts as they appear[ed] to [Craig,] the person making the decision.'" Id. (quoting Conroy v. Vilsack, 707 F.3d 1163, 1174 (10th Cir. 2013))(emphasis deleted). Thus, the pertinent question in determining pretext in this instance is not whether Craig's decision to terminate Thomas' employment, in the absence of any independent investigation, was "'wise, fair or correct[,]'" id. (quotation omitted); rather, the relevant inquiry is whether Craig, after input from OCOM, Jan-Pro's customer, genuinely believed that he "had no options[,]" Craig Deposition at p. 18, line 17, other than to terminate Thomas' employment.

Indeed, as the Tenth Circuit has repeatedly held, "[e]vidence that the employer should not have made the termination decision—for example, that the employer was mistaken or used poor business judgment—is not sufficient to show that the employer's explanation is unworthy of credibility." Swackhammer, 493 F.3d at 1169-70 (citations omitted). Although Thomas need not at this stage establish conclusively that Jan-Pro's reasons for her termination were pretextual, "she [is] . . . required to 'establish that there

---

[54]In her response to Jan-Pro' motions, Thomas stated that the events occurring on August 14, 2015, were "actually fabricated." Doc. 48 at 24. Absent any evidence to support this assertion, other than Thomas' self-serving affidavit, the Court has disregarded the same.

is a genuine factual dispute with regard to the truth.'" Id. at 70 (quotation omitted).

Viewing the evidence in the light most favorable to Thomas, the Court finds that she has not come forward with specific facts that would support the conclusion by a reasonable juror that Jan-Pro's proffered rationale for its decision to terminate her employment is a pretext for race and national origin discrimination. E.g., Tran v. Sonic Industries Services, Inc., 490 Fed. Appx. 115, 118 (10th Cir. 2012)(to oppose summary judgment, plaintiff must do more than provide subjective interpretation of evidence; she must marshal admissible evidence of material fact)(cited pursuant to Tenth Cir. R 32.1). Because summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which th[at] party will bear the burden of proof at trial[,]" Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986), the Court finds that Jan-Pro is entitled to judgment as a matter of law on Thomas' Title VII, section 1981 and OADA race- and national-origin-based discrimination claims.

As to Thomas' claims that she was retaliated against because she engaged in protected activity in violation of Title VII, section 1981 and the OADA by Jan-Pro and, assuming exhaustion has occurred and such claims are timely, in violation of Title VII, section 1981 and OADA by OCOM, because she complained about the allegedly racially hostile environment at OCOM, "'the showing required to establish retaliation is identical under [section] 1981 and Title VII[.]" Thomas v. Berry Plastics Corp., 803 F.3d 510, 514 n.4 (10th Cir. 2015) (quoting Twigg v. Hawker Beechcraft Corp., 659 F.3d 987, 998 (10th

Cir. 2011)). Accordingly, the Court has considered these claims[55] and Thomas' OADA retaliation claim[56] together.   In doing so, because Thomas has presented only circumstantial evidence, the Court has again applied the McDonnell Douglas burden-shifting framework.[57]

> Under this framework, Thomas

> bears the initial burden of establishing a prima facie case of retaliation by demonstrating that (1) . . . she engaged in a protected activity, (2) . . . she suffered a material adverse action, and (3) there was a causal connection between the protected activity and the adverse action.

Id. (citation omitted).   If Thomas does so, then Jan-Pro and OCOM "must offer a legitimate, non-retaliatory reason for the adverse employment action." Metzler v. Federal Home Loan Bank of Topeka, 464 F.3d 1164, 1171 (10th Cir. 2006)(citation omitted).

---

[55]Title VII provides that

> [i]t shall be an unlawful employment practice for an employer to discriminate against any . . . employee[ ] . . . because [s]he has opposed any practice made an unlawful employment practice [under Title VII] . . . .

42 U.S.C. § 200e-3(a).   The United States Supreme Court has recognized that "[section] 1981 [likewise] encompasses retaliation claims[,]" CBOCS West, Inc. v. Humphries, 553 U.S. 442, 446 (2008); e.g., Nassar, 133 S. Ct. at 2529 (statute prohibits not only racial discrimination, but also retaliation against those who oppose it), and, together with Title VII's "opposition clause," prevents an employer from retaliating against an employee because the employee has voiced her opposition to an unlawful employment practice. See Tilghman v. Kirby, 662 Fed. Appx. 598, 603 (10th Cir. 2016)(analyzing OADA retaliation claim under same standard as Title VII retaliation claim).

[56]See n.41, supra.

[57]Under both Title VII and section 1981, "'a plaintiff bringing a . . . retaliation claim must establish that retaliation played a part in the employment decision . . . .'" Parker Excavating, Inc. v. Lafarge West, Inc., 863 F.3d 1213, 1220 (10th Cir. 2017)(quoting Twigg, 659 F.3d at 998). (further quotations omitted).   As the Tenth Circuit has recognized, "[t]his can be done in two ways[:]   First, a plaintiff can show that retaliatory animus played a 'motivating part' in the employment decision[, and] [s]econd, a plaintiff can rely on the burden-shifting framework set forth in McDonnell Douglas . . . to prove retaliation indirectly." Id. (citations omitted).

Thomas "then bears the ultimate burden of demonstrating that the defendant[s'] proffered reason is pretextual." Id. (citation omitted).

As to her claim against Jan-Pro, Thomas, during her deposition, was asked the following question and she gave the following answer:

> Q.  Do you believe that . . . Craig retaliated against you for complaints that
>
> you made to him when he terminated your employment?
>
> A.  No.  I don't think he retaliated against me, . . . I just think that maybe he
>
> felt like he had no choice but to just go with what they said.

III Thomas Deposition at p. 370, lines 3-8.

Absent evidence that shows that Jan-Pro's decision to discharge Thomas occurred under circumstances that give rise to an inference of unlawful retaliation, the Court finds Jan-Pro is entitled to judgment as a matter of law on Thomas' claims that she was retaliated against because she engaged in protected activity in violation of Title VII, section 1981 and the OADA.

As to OCOM, Thomas has argued that she engaged in protected opposition to discrimination when she complained about the "out and out racism[,]" Doc. 48-2 at 2, and "the unfairness . . . the black housekeepers[,]" id., had experienced at OCOM, and the Court assumes, without deciding, that Thomas has sufficiently shown this element of her prima facie case.  The Court likewise finds, for purposes of OCOM's motion, that Thomas has shown element two: that she suffered a materially adverse employment action[58]—in this case, termination.  The Court finds, however, that Thomas has failed to establish a

---

[58]As to this element, a "'materially adverse' action[ ] . . . is[ ] action 'that would dissuade a reasonable worker' from engaging in protected activity." Dye v. Moniz, 672 Fed. Appx. 836, 839 (10th Cir. 2016)(quotation omitted).

genuine dispute with regard to the third element of her prima facie case and that her failure to do so is fatal to her retaliation claims against OCOM under Title VII, section 1981 and OADA.

The United States Supreme Court has held "that a plaintiff making a retaliation claim . . . must establish that . . . her protected activity was a but-for cause of the alleged adverse action by the employer." University of Texas Southwestern Medical Center v. Nassar, 133 S. Ct. 2517, 2534 (2013). "The evidence of but-for causation 'must be based on more than mere speculation, conjecture, or surmise.'" Ward v. Jewell, 772 F.3d 1199, 1203 (10th Cir. 2014)(quoting Bones v. Honeywell International, Inc., 366 F.3d 869, 875 (10th Cir. 2004)).[59]

Temporal proximity between Thomas' complaints about her work environment while employed by OCOM and her subsequent termination by Jan-Pro is lacking. Moreover, Jan-Pro, not OCOM, made the decision to discharge Thomas. Accordingly, the Court finds that a reasonable juror could not infer retaliation by OCOM in August 2015. OCOM therefore is likewise entitled to the relief it has requested on these claims.

Based on the foregoing, the Court

(1) GRANTS OCOM's Motion for Summary Judgment [Doc. 32] filed on June 30, 2017, to the extent the Court DISMISSES Thomas' Title VII and OADA claims for discrimination, harassment and retaliation for failure to exhaust and further GRANTS

---

[59]Thomas' termination resulted from OCOM's decision to bar Thomas from its premises and the absence of an available, alternative worksite.  According to Thomas, by fabricating the events on August 14, 2015, "OCOM . . . exact[ed] its revenge on . . . Thomas and her complaints of racism in its business."  Doc. 47 at 6.  "Thomas' termination was a farce orchestrated by OCOM and enacted by Jan-Pro at its demand.  Any other reason given is pretext to obscure the actual reason for her termination[:]  retaliation for her complaints about the conditions at OCOM."  Id. at 7.

judgment as a matter of law in OCOM's favor on Thomas' section 1981 claims for discrimination, harassment and retaliation and (if exhaustion has occurred) in OCOM's favor on Thomas' Title VII and OADA claims for discrimination, harassment and retaliation;

(2) GRANTS Jan-Pro's Motion for Summary Judgment [Doc. 33] filed on June 30, 2017, to the extent the Court DISMISSES Thomas' Title VII and OADA claims for harassment for failure to exhaust and further GRANTS judgment at a matter of law in Jan-Pro's favor and against Thomas on Thomas' claims seeking relief under Title VII and OADA for discrimination and retaliation and (if exhaustion has occurred as to Thomas' Title VII and OADA claims for harassment) GRANTS judgment in Jan-Pro's favor on these claims as well; and

(3) ORDERS that judgment in accordance with this Order issue forthwith.

ENTERED this _30th_ day of August, 2017.

LEE R. WEST
UNITED STATES DISTRICT JUDGE